MAYER BROWN LLP
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
MICHAEL A. MOLANO (SBN 171057)
mmolano@mayerbrown.com
CLIFF A. MAIER (SBN 248858)
cmaier@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA  94306-2112
Telephone:   (650) 331-2000
Facsimile:    (650) 331-2060

Attorneys for Plaintiff
CIVOLUTION B.V.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| CIVOLUTION B.V., <br><br> Plaintiff, <br><br> v. <br><br> DOREMI LABS, INC., <br><br> Defendant. | Case No. 2:14-cv-00962-JAK-RZ <br><br> **PLAINTIFF CIVOLUTION B.V.'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> Date:      November 3, 2014 <br> Time:     10:00 a.m. |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  THE '072 PATENT............................................................................. 1

    A.  General Technology ................................................................. 1

    B.  The Flicker Problem ............................................................... 2

    C.  The '072 Patent's Solution...................................................... 3

III.  LEGAL STANDARDS FOR CLAIM CONSTRUCTION ......................... 4

IV.  TERMS IN DISPUTE .......................................................................... 6

    a.  "Value" (claims 1 and 5)........................................................ 6

    b.  "image area" (claims 1 and 5)................................................ 8

    c.  "dividing an image of the sequence of images into at least a first and a second image area." (claims 1 and 5)........................................ 10

    d.  "oppositely modif[y/ies] the mean luminances of the first and second image areas" (claims 1 and 5)................................................. 11

    e.  "image halves" (claims 3 and 4) ......................................... 13

    f.  "image modifying means" (claim 5)..................................... 15

    g.  "means for dividing an image" (claim 5)........................... 19

V.  CONCLUSION ................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Al-Site Corp. v. VSI International Inc.*,
174 F.3d 1308 (Fed. Cir. 1999) ............................................................. 5

*Altiris, Inc. v. Symantec Corp.*,
318 F.3d 1363 (Fed. Cir. 2003) ........................................................... 16

*Caterpillar Inc. v. Detroit Diesel Corp.*,
961 F. Supp. 1249 (N.D. Ind. 1996) ...................................................... 5

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 1996) ............................................................... 5

*In re Buchner*,
929 F.2d 660 (Fed. Cir. 1991) ............................................................. 11

*In re Olaf H. Dossel and Walter H. Kullmann*,
115 F.3d 942 (Fed. Cir. 1997) ............................................................. 18

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014) .......................................................................... 5

*Omega Engineering, Inc. v. Raytek Corporation, et al.*,
334 F.3d 1314 (Fed. Cir. 2003) ............................................................. 7

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................ 5, 8

*Sage Products, Inc. v. Devon Industries, Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ........................................................... 16

*Starhome GMBH v. AT&T Mobility LLC, et. al*,
743 F.3d 849 (Fed. Cir. 2014) ........................................................... 5, 6

*Teleflex, Inc. v. Ficosa North America Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ............................................................. 5

*TriMed, Inc. v. Stryker Corp.*,
514 F.3d 1256 (Fed. Cir. 2008) ........................................................... 16

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ............................................................. 8

*United States v. Telectronics, Inc.*,
857 F.2d 778 (Fed. Cir. 1988) ............................................................. 11

STATUTES

35 U.S.C. § 112, sixth paragraph ............................................................ 5

35 U.S.C. §112(f) ............................................................................................*passim*

**OTHER AUTHORITIES**

Oxford American Dictionary ......................................................................... 8, 9, 13

Webster's Encyclopedic Unabridged Dictionary of the English Language ............ 14

## I.    INTRODUCTION

This case involves a single patent having five total claims, with four claims asserted.  There are only seven terms in dispute and the technology at issue relates to a simple concept—encoding information into a movie presentation by brightening or darkening parts of the picture.

This simplicity is lost, however, by Defendant Doremi Labs, Inc.'s ("Doremi's") proposed constructions.  Doremi repeatedly proposes construing non-technical terms that already have a clear plain and ordinary meaning.  In contrast, Plaintiff Civolution B.V. ("Civolution") proposes that the vast majority of the disputed terms are simple, non-technical terms (*e.g.*, "image halves") that do not require construction.  Civolution therefore requests that the plain meaning of the disputed terms be adopted by the Court.

## II.    THE '072 PATENT

Civolution, the owner of the '072 Patent,[1] is the leading provider of technology and solutions used to identify, manage, and monetize media content.  Civolution offers digital watermarking and fingerprinting applications for media interaction, media intelligence and media protection.

Civolution was formed in October 2008 as a spin-off of Royal Philips Electronics (commonly known as "Philips"), the Dutch conglomerate formed in 1891.  In July 2009, Civolution acquired Software and Technology Solutions from Thomson-STS.  This combination of global powerhouses formed Civolution and brought together the brightest minds in the content protection field.

### A.  General Technology

The '072 Patent generally relates to a method and arrangement for

---

[1] U.S. Patent No. 7,844,072 ("'072 Patent") attached as Exhibit 1 to Declaration of Michael A. Molano In Support of Plaintiff Civolution B.V.'s Opening Claim Construction Brief ("Molano Decl.").

embedding a watermark in motion image signals such as movies projected in cinemas. 1:7-9.[2]  The invention also relates to a method and arrangement for *detecting* the watermark embedded in the motion image signals. 1:9-11.

As explained in the patent specification, watermark embedding is an important aspect of copy protection strategies. 1:15-17.  In particular, the invention can solve the problem of illegal copying of cinema material by means of handheld video cameras, a practice that was "already common" at the time of the invention. 1:20-29.  The invention contemplates inserting a watermark, at showtime, that can be used to identify the cinema, the presentation time, the cinema operator, or other useful data. 1:27-31.  The claims of the '072 Patent recite that the watermark is embedded by adding to or subtracting from the luminance (*i.e.*, brightness) value of pixels in at least some of the images in the movie. 8:37-45.[3]

The specification also explains how to ensure "robustness" of the watermark so that it survives in illicitly copied versions of the movie.  For example, the specification states that a goal is robustness even in the face of issues like light filtering, transfer to tape, geometric distortions, changes of perspective, and other issues.  1:31-39.

**B. The Flicker Problem**

The '072 Patent specification takes great pains to address one problem that can cause degradation of the watermark in illicit copies: flickering of the image. There are multiple potential sources of flicker – first, the watermark, if it involves

---

[2] The nomenclature "1:7-9" refers to Column 1, lines 7-9 of the '072 Patent. Citations in this format will refer to the specification of the '072 Patent attached to the Molano Decl. as Exhibit 1.

[3] Simply stated, one brightens or darkens two parts of the image, and depending on how the images are changed, one can encode information into the movie presentation.  For example, a pattern of "brighten-brighten-darken-darken-brighten" for the left half of successive groups of frames may mean "this movie was projected at Regal Cinemas in downtown Los Angeles."

1   brightening and dimming images on the frames, inherently embeds some flicker.

2   1:53-54.  Flicker is also cause by a mismatch between the "frame rate" of the

3   cinema projector and the handheld camera that is illegally being used to record the

4   movie.  1:59-63.  Flicker is annoying, and de-flickering tools were widely available

5   at the time of the invention. 1:63-67.

6       The inventors noted that de-flickering tools work by adjusting the mean

7   luminance of successive images so as to reduce variation between them.  2:21-26.

8   Assume that the image is composed of individual pixels, and that each pixel has a

9   brightness value, with higher values corresponding to brighter pixels.  The way the

10  de-flickering tools work is such that if the average brightness of a first image is

11  "100," and the average brightness of the second image is "150," the deflickering

12  tool will make the first image brighter and the second image dimmer, for example

13  making the average brightness of each image 125.

14      With the prior art watermarking scheme, deflickering would severely

15  degrade the watermark because variations in brightness which represent the

16  watermark would be lost.

17  **C.   The '072 Patent's Solution**

18      The brilliant insight had by the inventors of the '072 Patent is that it is

19  possible to embed the watermark in the

20  successive images in such a way that even if

21  de-flicker tools ratchet the brightness of the

22  image up or down, the watermark is still

23  easily detectable.



24      The way this works is ingeniously

25  simple.  First, you divide an image in the

26  frame into at least a first and a second image area.  2:11-14.

27      If, in the prior art, you would have darkened the entire image (say to encode

28  a "-1"), then the '072 Patent teaches you instead darken the first image area and

1  brighten the second image area.

2  If, in the prior art, you would have brightened the entire image (to encode a

3  "+1"), you just reverse it and brighten the first image area and darken the second

4  image area.  This is illustrated in the figure above.

5  A de-flickering tool, seeing a prior art bright image followed by a dark

6  image, would darken the first and brighten the second, as shown in the figure

7  below.



8

9

10

11

12

13

14

15

16  In the prior art, if the de-flickering tool dims the first image and brightens

17  the second, the average brightness of the two images may be indistinguishable, as

18  shown in exaggerated fashion in columns (e) and (f) in the figure above.  Unlike in

19  the prior art, using the invention of the '072 Patent would not introduce "flicker"

20  since the average brightness of the entire image is not changed.  If a de-flickering

21  tool was used to deal with flicker caused by other sources (such as frame rate

22  mismatch), however, even though it would dim and brighten the images, the

23  *difference* in brightness value between watermark-brightened and watermark-

24  darkened areas is still large and the direction of each change – brightening vs.

25  darkening – is clear.  Hence the watermark is still detectable after de-flicker tools

26  are run on illegal copies.

27  **III.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION**

28  Claim terms are generally given their plain and ordinary meaning to a person

of ordinary skill in the art in the context of the specification and the prosecution history.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*);  *See also Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

Constructions should deviate from ordinary and customary meaning only in limited circumstances. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Starhome GMBH v. AT&T Mobility LLC, et. al,* 743 F.3d 849, 856 (Fed. Cir. 2014) (citations omitted).

Although not all claim terms are amenable to construction, "the definiteness requirement must take into account the inherent limitations of language." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128 (2014).

For 35 U.S.C. §112(f) to apply, it must be clear that the element in the claims is set forth, at least in part, by the function it performs as opposed to the specific structure, material, or acts that perform the function.  *See Caterpillar Inc. v. Detroit Diesel Corp.*, 961 F. Supp. 1249, 1255 (N.D. Ind. 1996) (stating that 35 U.S.C. § 112, sixth paragraph, "applies to functional method claims where the element at issue sets forth a step for reaching a particular result, but not the specific technique or procedure used to achieve the result."); *Greenberg v. Ethicon Endo-Surgery, Inc*., 91 F.3d 1580, 1583, (Fed. Cir. 1996) ("detent mechanism" defined in functional terms was not intended to invoke 35 U.S.C. § 112, sixth paragraph); see also *Al-Site Corp. v. VSI International Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999) (although the claim elements "eyeglass hanger member" and "eyeglass contacting member" include a function, these claim elements do not invoke 35 U.S.C. § 112, sixth paragraph, because the claims themselves contain sufficient structural limitations for performing those functions).

## IV.   TERMS IN DISPUTE

### a.   "Value" (claims 1 and 5)

| Civolution Proposed Construction | Doremi Proposed Construction |
|---|---|
| Plain and ordinary meaning. | A value that is not zero |

The parties dispute that "value" cannot include values of zero.  The parties apparently agree that "value" has a plain and ordinary meaning, as Doremi's proposed construction includes the term itself.  The parties also agree that other than the question of whether or not "value" can be zero, no further construction is necessary.  Doremi's proposal attempts to shoehorn "not zero" into the claim.

At the outset, terms used in claim limitations are to be given their ordinary meanings unless it appears the inventor used them differently.  *Starhome GMBH v. AT&T Mobility LLC, et. al,* 743 F.3d 849, 856 (Fed. Cir. 2014).  The context of the use of the term "value" in the claims and specification makes it clear that the inventors were using "value" in the customary sense, and ascribing it no special meaning:

- "representing the watermark by a sequence of watermark samples each having a **value**"
- "adding the watermark sample **value** to the luminance **value** of pixels"
- "subtracting the watermark sample **value** from the luminance **value** of pixels"

There is nothing inherent in "representing" something with a "value" that prevents that value being zero.  And elementary mathematics permits addition and subtraction of zero.  Nor is there anything in the specification or elsewhere to suggest that *luminance* cannot have a value of zero.

Doremi's theory seems to be based on an embodiment in which the watermark sample values are described as being either +1 or -1.  This theory fails for at least three reasons.

- 6 -

First, this argument, even if persuasive, would only apply to the *watermark sample* "value" and not the *luminance* value.  It is a fundamental principle of claim construction law that a claim term should have the same meaning throughout the claims, and certainly throughout a single claim.  *Omega Engineering, Inc. v. Raytek Corporation, et al.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

Second, the patent specification makes clear that adding or subtracting watermark values of zero from the luminance value of pixels falls within the embodiments of the claimed invention.  For example, the specification recites that when adding or subtracting the value, "[c]lipping is performed where necessary." 2:62-3:1.  "Clipping" refers to a situation where a pixel is already at its maximum or minimum value, so addition or subtraction cannot change the value (*i.e.*, the amount added or subtracted is zero).

Finally, the Federal Circuit has cautioned against reading negative limitations (*e.g.*, "but not zero") into claims where there is no express disclaimer that would justify doing so.  *Omega Engineering, Inc.*, 334 F.3d at 1322 (reversing district court's addition of a negative limitation, because "[b]eyond the words of the claim, neither the district court nor Raytek has identified any express disclaimer or independent lexicography in the written description that would justify adding that negative limitation.")

Because the presumption is that "value" should have it's customary meaning, and given the flaws in Doremi's theory, the Court should decline to add an additional limitation to this ordinary, non-technical, term.

- 7 -

### b. "image area" (claims 1 and 5)

| Civolution Proposed Construction | Doremi Proposed Construction |
|---|---|
| Plain and ordinary meaning. To the extent a recitation of the plain and ordinary meaning is necessary, Civolution proposes "continuous part of an image" | "continuous part of an image comprising at least one pixel" |

The dispute here is whether an area may be only "one pixel." The parties apparently agree that "image" requires no construction, as Doremi's proposed construction includes the word. The parties also agree that an "area" is a "continuous part" of the image.

Claim construction is not an obligatory exercise in redundancy. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). A person having ordinary skill in the art would understand the concept of "area" from everyday experience without the need for the court to restate the term in different words. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Moreover, there is no support in the specification for the idea that an "area" may be a single pixel. Pixels, or "picture elements," are the fundamental building blocks of the image. The image is composed of indivisible pixels, each of which is a single spot. A single pixel is not an area any more than a single grain of sand is an "area" on the beach or Queen's Bishop 3 is an "area" on the chess board.

Indeed, the plain and ordinary meaning of area, consistent with the agreed part of the parties' construction, is a "continuous part." "Continuous" implies plurality. This is consistent with all the extrinsic evidence of the ordinary meaning, including dictionary definitions. For example, the Oxford American

Dictionary defines "area" as "a region" and defines "region" as "**a continuous part** of a surface or space or body, with or without definite boundaries or with certain characteristics." Molano Decl., Ex. 2.

The claims always refer to "pixels" in the plural.  Claim 1 refers to "pixels of the first image area" and "pixels of the second image area."  The claims also refer to modifying the "mean luminances of the first and second image areas" by adding and subtracting values from these plural pixels.  "Mean" refers to the *average*, which implies that there is more than one pixel to take the average of.

Moreover, the purpose of the invention would be defeated if the image area consisted of just one pixel.  The invention is largely directed to illicit filming of movies off of a cinema screen by handheld cameras.  1:20-26.  The specification states that "[r]obustness to geometric distortions is a key requirement for such watermark embedding schemes." 1:31-32.  The specification also recites a litany of sources of distortions (scaling, shearing, filtering, etc.) that need to be dealt with by such a robust system. 1:32-37.  If the image area is a single pixel projected onto a distant cinema screen, recorded by a handheld camera under such conditions, the likelihood of a single pixel being detectable on an illicit copy is close to nil.

Additionally, the invention is described as increasing or decreasing a "global property" (*e.g.*, the mean luminance) of each image area. 2:14-21.  The term "global property" is in contrast to "local property;" the former refers to an aggregate property of *multiple* pixels while the latter would refer to a property of one pixel.

In short, Doremi is seeking a construction that is contrary both to the plain and ordinary meaning of the term and to the intrinsic evidence.

### c. "dividing an image of the sequence of images into at least a first and a second image area." (claims 1 and 5)

| Civolution Proposed Construction | Doremi Proposed Construction |
| --- | --- |
| Plain and ordinary meaning.  Civolution objects to an enablement argument made in the absence of a proposed claim construction. | Lacks enablement.  In the event the Court finds this term is enabled, we agree that it should be construed as plain and ordinary meaning. |

Doremi does not provide an unconditional construction, but rather argues that it needs only propose a construction if the term is enabled.  It appears that Doremi agrees that the term *can* be construed, as it is not arguing that the term is indefinite.  And it appears that Doremi agrees that, if construed, the term should be given its plain and ordinary meaning.  Thus there appears to be no *claim construction* dispute with respect to this term.  Instead, Doremi improperly raises this invalidity argument in a claim construction context.

The plain and ordinary meaning of this term falls well within the understanding of a layperson.  A movie consists of a sequence of frames, each of which comprises one or more images, (for example each actor, the background, the entire frame, the left part of the frame, etc., are images on the frame)  As a result, a movie comprises a sequence of images.  "An image of the sequence of images" is simply one of the images in that sequence, and requires no special disclosure for a layperson, let alone a person of ordinary skill in the art, to understand.  Dividing such an image into a first and a second image area is also easy to comprehend, particularly in light of the disclosure in the specification that describes the purpose and results of doing so.

For example, the patent provides an extensive mathematical proof explaining how dividing the image into two parts prevents de-flickering tools from removing the watermark.  6:63-8:15.  The patent provides mathematical expressions defining the two areas.  7:5-10.  There is no evidence a person having ordinary skill in the art would not, given the extensive description in the patent

- 10 -

1   specification, be able to practice the invention.  *United States v. Telectronics, Inc.*,

2   857 F.2d 778, 785 (Fed. Cir. 1988) ("The test of enablement is whether one

3   reasonably skilled in the art could make or use the invention from the disclosures

4   in the patent coupled with information known in the art without undue

5   experimentation.").  Further, a patent need not teach, and preferably omits, what is

6   well known in the art.  *In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991).

7          As there is apparently no dispute as to claim construction, this term should

8   be construed according to its plain and ordinary meaning.  Further, as Doremi

9   clearly cannot meet its burden to meet the clear and convincing in proving lack of

10  enablement, Doremi's invalidity argument fails.

11              **d.  "oppositely modif[y/ies] the mean luminances of the first and**
12                  **second image areas" (claims 1 and 5)**

| Civolution Proposed Construction | Doremi Proposed Construction |
|---|---|
| Plain and ordinary meaning | "increase[s] the mean luminance of one area and decrease the mean luminance of the other area by the same amount" |

17         The dispute, once again, is over Doremi's attempt to inject a new claim

18  limitation into what is, on its face, a self-explanatory term.  The parties apparently

19  agree that "mean luminance" requires no construction, as Doremi uses the term

20  repeatedly in its proposed construction.  The dispute is thus whether "oppositely

21  modif[ying]" is to be narrowed from its plain and ordinary meaning so as to be

22  limited to being opposite not just in *direction* but in amount.

23         Importantly, the specification refers to "opposite" in terms of *direction* of

24  the change (*e.g.*, brightening vs. dimming) and not amount.  For example, "[t]he

25  other value of the watermark sample is embedded in the opposite way, *i.e.* by

26  decreasing the global property of the first image area and increasing the global

27  property of the second image area."  2:17-21.  As the patent notes, what's critical

28  in preserving the watermark against de-flickering tools is the sign (*i.e.,* direction)

of the modifications to the two areas, not the magnitude.  For example, "[b]ecause this [de-flickering] operation does not affect the (sign of the) modifications applied to the distinct image areas, the watermark information will be retained." 2:25-28.

Moreover, Doremi's construction directly contradicts the specification's explanation of "oppositely" modifying image areas.  The specification recites an embodiment in which "one applied watermark sample w(n) [is added] to every pixel of the first image area, whereas embedding stage 12 subtracts the same watermark sample from every pixel of the second image area. **Clipping is performed where necessary**.  **The mean luminances of the first and second image areas are thus oppositely modulated** by the watermark." 2:64-3:3 (emphasis added).

The specification thus clearly states what the inventors meant by "oppositely." Doremi's construction is inconsistent with the specification at least in that it would disallow clipping.  "Clipping" of highlights and shadows results from the fact that pixels have a maximum brightness and minimum brightness. Because luminance is represented in the computer's memory in finite space, it has finite range (for example between 0 and 255).  If the luminance is at its maximum value, the watermark value cannot be added to it, as no higher number is possible.  So the luminance remains unchanged. This will result in the image area's *mean* luminance being increased by *less* than the watermark value amount, and by an amount that is unlikely to match the mean *decrease* in luminance of the *other* area.

Furthermore, to the extent the "by the same amount" portion of Doremi's proposed construction is ignored, the rest of its proposed construction is unnecessary.  The claims already recite that the modification of the image is done by "adding the watermark sample value to the luminance value of pixels of the first image area and subtracting the watermark sample value from the luminance value of pixels of the second image area." '072 Patent Claim 1.  Hence, "increase" and "decrease" are redundant.

This also illustrates a second problem with Doremi's proposal: unlike the language in the specification that describes that the areas are oppositely modulated by adding or subtracting a value to or from *all* the pixels in the first and second areas, the claim is broader in that it expressly *omits* the requirement that adding or subtracting be done to *all* pixels.   This is what the specification refers to as "the simplest embodiment."  2:62-64.  Notably, in contrast to this "simplest embodiment," the claim limitation merely describes adding or subtracting to or from the "luminance value of pixels of the [first or second] image area."  Thus the claim, on its face, reads on systems where half the pixels in the first area are increased (thus raising the average luminance in that area by half the sample value) and all of the pixels in the second area are decreased (thus reducing the average luminance in that area by the full sample value).  This is unsurprising because the specification recites that "[t]he preferred embodiment of the embedder which is shown in FIG. 1 further adapts the embedding depth in dependence upon the image contents."  3:22-24.  The specification then explains how pixels would be chosen for brightening or dimming based on "scaling factors" derived from analyzing the images for motion and texture.  3:24-30.

Doremi's proposal is thus nothing more than a mathematically unsound attempt to inject additional limitations into the claim by reading an embodiment into the term, and would result in excluding the stated preferred embodiment from all claims.

### e.  "image halves" (claims 3 and 4)

| Civolution Proposed Construction | Doremi Proposed Construction |
|---|---|
| Plain and ordinary meaning | "Two continuous parts of the image each comprising half of the image's pixels" |

Once again the dispute centers around Doremi's attempt to improperly inject limitations into a non-technical term.

- 13 -

1    Doremi's proposed construction apparently differs from the plain and

2    ordinary meaning in two ways.  First, Doremi requires that the "image halves" be

3    "two continuous parts of the image."  This makes no sense when Doremi's

4    proposal is placed into the context of claims 3 and 4: "The method of claim 1,

5    wherein the first and second image areas are the [upper and lower][left and right]

6    of [] two continuous parts of the image…"  The reference to "two" is superfluous

7    and confusing.

8    Moreover, Doremi's requirement that the image halves be "continuous" is

9    confusing and redundant.  To the extent that Doremi derives the "continuous"

10   requirement from the term "image areas," then importing a property of a different

11   claim term into this claim term so as to modify it from its plain and ordinary

12   meaning is inappropriate.

13   The second part of its construction, "each comprising half of the image's

14   pixels," is newly proposed by Doremi.  Initially Doremi proposed that this term

15   should be construed as "a contiguous area of the image of approximately half of

16   the image's pixels."  Civolution presumes that Doremi now asserts that the number

17   of pixels in each half must be exactly equal.

18   The plain and ordinary meaning of "half" does not require that the two

19   halves be *exactly* the same in extent.  Nor is such a result implied by the

20   specification.

21   The dictionary definitions of "half" are instructive.  For example, the Oxford

22   American Dictionary defines "half" as "one of two equal **or corresponding** parts

23   into which a thing is divided."  Molano Decl., Ex. 2 (emphasis added).  Equality is

24   not necessary so long as the parts "correspond," as in left vs. right, or top vs.

25   bottom.  Webster's Encyclopedic Unabridged Dictionary of the English Language,

26   in turn, defines "half" as "one of two equal **or approximately equal** parts of a

27   divisible whole, as an object, unit of measure or time, etc.; a part of a whole equal

28   **or almost equal** to the remainder."  Molano Decl. Ex. 3 (emphasis added).

Moreover, the invention described in the patent works so long as "the mean luminance of the entire pixel [*sic*[4]] remains **essentially** the same."  Molano Decl., Ex. 4 (Amendment in Response to Final Office Action, March 31, 2010). Assuming the mean luminance of one half is raised by approximately the same as the mean luminance of the other half is decreased, and assuming the two halves are approximately the same size, then the mean luminance of the entire image (over all pixels) remains "essentially the same."  Of course, this is even the case if the size of the halves is quite different, if the luminance changes are adjusted accordingly.

Further, Doremi's use of "half" in its current proposed construction is circular and confusing.  Doremi states that an image <u>half</u> is a "continuous part of the image comprising <u>half</u> of the image's pixels."  This will only serve to confuse the jurors.

As there is no evidence supporting Doremi's restrictive construction, and as it is circular and would only serve to confuse the jury which will be able to understand this simple, non-technical term, Civolution submits that this term should be given its plain and ordinary meaning.

### f.  "image modifying means" (claim 5)

| Civolution Proposed Construction | Doremi Proposed Construction |
|---|---|
| To the extent 35 USC §112(f) applies, corresponding structure is embedding stages 11, 12 and equivalents. | Lacks corresponding structure.<br><br>Doremi does not agree that embedding stages 11, 12 and equivalents are sufficient structure. |

The primary dispute with respect to this term is whether 35 U.S.C. §112(f) applies.  The secondary dispute is whether, if 35 U.S.C. §112(f) applies, there is sufficient structure under 35 U.S.C. §112(f).  The claim limitation is presumed to invoke 35 U.S.C. § 112(f) when it explicitly uses the term "means" or "step" and

---

[4] From the context this should be "image".

includes functional language.  That presumption is overcome when the limitation further includes the acts or structure necessary to perform the recited function. *Sage Products, Inc. v. Devon Industries, Inc.,* 126 F.3d 1420, 1427 (Fed. Cir. 1997) ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means plus function format."); *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008) ("Sufficient structure exists when the claim language specifies the exact structure that performs the function in question without need to resort to other portions of the specification or extrinsic evidence for an adequate understanding of the structure."); see also *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376 (Fed. Cir. 2003).

With respect to "image modifying means," 35 U.S.C. §112(f) does not apply because the term is *not* set forth by the function it performs, but rather by the *acts necessary to perform that function*.  Indeed, the claim sets forth the structure of the image modifying means by reference to the steps it must perform, in excruciating detail.  The claim drafter did not merely recite "means for modifying the image," but rather precisely delineated the nature of this mechanism using two paragraphs and 151 words:

> image modifying means being arranged for modifying the image in accordance with a watermark sample from the sequence of watermark samples, the modification comprising (1) adding the watermark sample value to the luminance value of pixels of the first image area and (2) subtracting the watermark sample value from the luminance value of pixels of the second image area to oppositely modify the mean luminances of the first and second image areas in accordance with the watermark sample
>
> wherein, (3) the modifying means is further arranged to repeat the dividing an image of the sequence of images and (4) modifying of the image for each of the sequence of watermark samples in accordance with a watermark sample from the sequence of watermark samples such that (5) each watermark sample oppositely modifies the mean luminances of the first and second image areas of a different image of the sequence of images until the entire watermark is embedded.

Claim 5 (number sequence added).

The structure of the image modifying means is thus defined in the claim with

reference to its "arrange[ment]" (*i.e.*, a structure) for carrying out at least five steps, some with substeps. The claim thus clearly elaborates sufficient acts to perform the recited function, and is thus not subject to 35 U.S.C. § 112(f).



Fig.1

To the extent that this claim term *is* subject to 35 U.S.C. § 112(f), then embedding stages 11, 12 and equivalents are clearly sufficient structure. Fig. 1 of the '072 Patent is a signal processing block diagram which illustrates the invention in the conventional manner used in the art of signal processing. This figure illustrates where embedding stages 11 and 12 fit into the system, and depicts their inputs and outputs.

The symbols used for stages 11 and 12, circles containing mathematical operators, indicate the operation to be performed by each of these stages. The specification explains that embedding stage 11 adds one applied watermark sample w(n) to every pixel of the first image area, whereas embedding stage 12 subtracts the same watermark sample from every pixel of the second image area. 2:62-67. The specification tells us that w(n) is the watermark sample being embedded in a frame. 3:19-20. Hence these stages perform the function of "modifying the image in accordance with a watermark sample from the sequence of watermark samples," as recited in the limitation.

The specification further recites that the addition or subtraction operations can be performed using clipping. The specification further clearly defines the outputs of the embedding stages 11 and 12 as:

$$F_{w,1}(\underline{n},k) = F_1(\underline{n},k) + C_{F,1}(\underline{n},k)w(k); \;\; F_{w,2}(\underline{n},k) = F_2(\underline{n},k) - C_{F,2}(\underline{n},k)w(k)$$

3:30-35. The specification also recites that the embedding stages may carry out these operations "in a time-sequential manner by a single processing circuit under appropriate software control." 3:36-39. In the art, "time-sequential" refers to

1   circuits that have memory structures (such as latches or flip flops), hence the

2   specification tells us specifically what steps are necessary to transform specific

3   inputs to specific outputs, and informs a person of ordinary skill in the art what

4   types of circuits would be appropriate for doing so.

5       This situation is similar to the situation addressed by the Federal Circuit in

6   *In re Olaf H. Dossel and Walter H. Kullmann*, 115 F.3d 942 (Fed. Cir. 1997).

7   Unlike the present patent which specifically recites a type of circuit and suggests

8   appropriate software control (*e.g.,* a computer), in *In re Dossel* neither the written

9   description nor claims recited anything about a computer.  In fact, unlike here, the

10  specification did not disclose what mathematical algorithm would be used to

11  compute the end result, instead stating that "known algorithms" could be used.

12  The Federal Circuit, found sufficient disclosure, stating:

13      Clearly  a unit which receives digital data, performs complex mathematical
        computations and outputs the results to a display must be implemented by or

14      on a general or special purpose computer (although it is not clear why the
        written description does not simply state "computer" or some equivalent

15      phrase). To bolster this result we note that, in the medical imaging field, it is
        well within the realm of common experience that computers are used to

16      generate images for display by mathematically processing digital input.
        Therefore, because of the specific facts in this case, the structure underlying

17      the function recited in Claims 8 and 9 is adequate for us to hold that the
        requirements of § 112 ¶ 2, that the invention be particularly pointed out and

18      distinctly claimed, are satisfied. *Id.* at 946.

19      The same rationale must apply here where the specification recites specific

20  circuits and the use of a computer, and provides the algorithms used to effect the

21  transformation of inputs to outputs.

22      In summary, this claim term is not "expressed as a means or step for

23  performing a specified function without the recital of structure, material, or acts in

24  support thereof," as recited  by 35 U.S.C. §112(f), and thus is not subject to the

25  special requirements imposed by that statutory provision.  However, even if

26  "means-plus-function" did apply, the specification describes the structure and

27  algorithms performed by the embedder with sufficient precision so as to be

28  definite.

### g. "means for dividing an image" (claim 5)

| Civolution Proposed Construction | Doremi Proposed Construction |
| --- | --- |
| To the extent 35 USC §112(f) applies, corresponding structure is dividing stage 10 and equivalents. | Lacks corresponding structure. Doremi does not agree that dividing stage 10 and equivalents are sufficient structure. |

As with the prior term, Doremi's proposal makes two potentially conflicting statements: it is again not clear whether Doremi disputes that there is *any* corresponding structure or if Doremi's position is simply that dividing stage 10 and equivalents are *insufficient* structure.

First, the term in context is "means for dividing an image of the sequence of images into at least a first and a second image area." Doremi does not dispute that, at the very least, an image area is a continuous part of the image. Thus the claim limitation, itself, tells us what the divider's inputs and outputs are.

Figure 1 of the patent (reproduced with highlighting below) depicts a block diagram illustrating an embodiment of the invention, using the symbols standard in the art of signal processing. The specification recites that dividing stage 10 "divides each image into a first (*e.g.*, upper half) area and a second (*e.g.*, lower half) area." 2:57-60, thus defining the output of the algorithm.



Fig.1

The specification also recites that the input to the dividing stage is a sequence of images or frames having a luminance $F(\underline{n}, k)$ at spatial position $\underline{n}$ of frame $k$. 2:52:54. The output functions $F_1$ and $F_2$ represent the luminance of the two image areas produced by the dividing stage. 2:59-61.

In explaining how the invention overcomes the problems of the prior art, the

- 19 -

specification also provides a detailed mathematical "proof" that further defines the structure of the divider.   For example, the specification explains, mathematically, how the watermark is detected, and derives that from the dividing of the image into two areas.  6:63-8:15.

And, as discussed with respect to the previous term, the specification contemplates that the invention would be carried out using sequential circuits under appropriate software control.

In summary, there is ample disclosure in the '072 Patent specification as to the structure of and algorithms performed by the dividing stage 10, and thus this term is definite.

## V.    CONCLUSION

For the foregoing reasons, Civolution respectfully requests that its proposed constructions be adopted.


DATED:  September 29, 2014          MAYER BROWN LLP

By: */s/ Michael A. Molano*
Michael A. Molano

Attorneys for Plaintiff
CIVOLUTION B.V.